## STILES RELF v. STATE.

No. A-6796.   Opinion Filed August 31, 1929.
Rehearing Denied September 28, 1929.
(280 Pac. 851.)

240

W. R. Withington, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

CHAPPELL, J. The plaintiff in error, Stiles Relf, hereinafter referred to as the defendant, was convicted in the district court of Oklahoma county of the crime of

murder and his punishment fixed at imprisonment in the state penitentiary for life.

This killing occurred in the town of Luther, on the 21st day of March, 1927. The defendant is a negro, and Joe Winters, the person killed, was also a negro. It appears that some negroes, who lived in or near the town of Luther, were engaged in a crap game in a room of a building that belonged to a negro by the name of Jackson. This building was located on a street running north and south, the building facing east, and the crap game took place on the ground floor of the building in the front room. The crap game progressed until about 12:30 or 1 o'clock in the morning. The parties had been drinking considerably, and shortly before the crap game broke up a white man by the name of Will Higdon, who appears to have been section foreman for the Frisco Railroad at Luther, joined the game, and just a short time before the game broke up it appears that Higdon and a negro by the name of George Diggs had a little spat, the result of Higdon calling Diggs "a nigger," but it appears that Diggs and Higdon made up their differences and that the defendant assisted in making friends between the two. After the game broke up, this defendant and Higdon left together and went to the house of a Mexican by the name of Carbajals looking for something to drink. Failing to get anything to drink there, according to the testimony of Higdon, he and the defendant went over to the defendant's house and proceeded to drink some beer, and the defendant insisted on going back to the crap game and shooting the fellows up. Higdon says that he demurred to this, but that the defendant got his shotgun and compelled him to walk ahead of him down to the building where the crap game had been taking place. It appears that as soon as they got down to the building, while there

was no crap game in progress, four or five negroes, including the deceased, were standing around the table where the crap game had taken place eating some barbecue. Higdon says that when the defendant got even with the front door, he saw him raise his shotgun and point it at the door (the upper part of the door being glass), and that he (Higdon) started to run away in a northeasterly direction towards his home, and immediately heard a shotgun fired, but did not look to see what became of the defendant. The deceased was killed by being shot in the head and neck with a shotgun loaded apparently with No. 6 shot. George Diggs, another negro who was there, also received a shotgun wound in the face, which wound proved not to be fatal. When the shotgun was fired, the lamp that was burning in the building immediately went out, and it was impossible for those in the building to see who fired the shot.

There is a sharp conflict between the testimony of Will Higdon and that of the defendant in this case. The testimony of each practically coincides up until the time they left the house of Carbajals. After that time, the defendant testifies that Higdon, as soon as he came out of the house of Carbajals, fired a pistol shot and asked the defendant to go down there and help him blow those negroes up, but the defendant insists that he refused and went home and went to bed, and that Higdon did not go home with him and that they had not been drinking; that Higdon was drunk and that he saw him go off in a northerly direction towards the place where the deceased was killed; that some time after he and Higdon stopped by Carbajals' house, and after he had gone to bed, the shotgun was fired, and that he did not have anything to do with it. In this story the defendant is corroborated by the testimony of his wife.

When the defendant was first arrested, he told the officers that he went home at 8 o'clock and went to bed and was not out of the house again during the night. Later, when confronted in the county attorney's office by the witness Low, he admitted that he was back at the place where the homicide was committed and left there at about 12:30, instead of 8 o'clock, as he had previously stated.

The defendant first contends that the trial court erred in permitting the county attorney to repeatedly ask incompetent, irrelevant, and immaterial questions, and that the county attorney was thereby guilty of misconduct, prejudicial to the substantial rights of the defendant. This court has held that it is prejudicial error for the county attorney to repeatedly ask questions which have for their purpose the getting before the jury of incompetent, irrelevant, and immaterial evidence, and for the county attorney to take an exception to the ruling of the trial judge in sustaining objections to such questions.

On the other hand, this court has held, in the case of Hendricks et al. v. State, 23 Okla. Cr. 19, 212 Pac. 330:

"The fact that the county attorney asked some questions which may have called for incompetent testimony is not prejudicial error, where the trial judge promptly sustained objections and no incompetent evidence was permitted to go to the jury, and there was no such repeated asking of these questions and exceptions to the ruling of the trial judge by the county attorney that amounted to prejudicial misconduct."

In the case at bar defendant's counsel in his brief has called the court's attention to only two instances wherein it is claimed the county attorney attempted to elicit incompetent evidence after the trial judge had ruled

that such evidence was not admissible. The first question complained of was as follows:

"Q. Now, counsel asked you if you had any opinion or conception of who fired that shot. Will you just tell this jury in your own opinion who did fire it?

"Mr. Withington: I object to that as calling for a conclusion of the witness.

"The Court: Sustained."

It appears from the record that the reason for the asking of this question by the county attorney was because defendant's counsel had asked the witness if he had any opinion or conception of who fired the shot. In a second instance pointed out by defendant, the county attorney was cross-examining the defendant as to a certain transaction which the defendant had previously stated took place at his house when he first told his story to the county attorney at his office the next day. The state was trying to show that the statement then made to the county attorney was inconsistent with the testimony then being given by the defendant, in which the defendant testified that he went to his house to get some wood and failed to say anything about having gotten whisky at that time. These questions were being asked for the purpose of impeaching the testimony of the defendant, by showing that his testimony was materially different to his voluntary statement made to the county attorney. This record does not disclose the repeated asking of incompetent questions on the part of the county attorney, and the repeated exceptions to the rulings of the trial judge in sustaining objections to such incompetent questions, such as was held to be reversible error in the case of Pickrell v. State, 5 Okla. Cr. 391, 116 Pac. 957.

This assignment of error is governed by the decision of this court in the case of Hendricks et al. v. State, 23 Okla. Cr. 19, 212 Pac. 330, and the later decisions of this court following the rule laid down in the Hendricks Case.

It is next contended that the trial court erred in permitting the state, on cross-examination of the defendant, to put defendant's character as a dangerous man in issue when defendant had not put his character or reputation in issue. It appears from the case-made that the following proceedings were had:

"Q. Well, I will ask you if it is not a fact when you get drunk you are a fellow that wants to fight and kill people? A. No.

"Mr. Withington: That is objected to as incompetent, irrelevant and immaterial; for the further reason that the witness had not put his reputation in issue.

"The Court: Answer the question. He has answered the question. Go ahead.

"Mr. Withington: Exception."

It will be noted that the defendant had answered the question before the objection was made and before any ruling of the trial court was given. There was no motion to strike the evidence and no request that the court instruct the jury to not consider such evidence. From the record it appears that the trial judge merely indicated by his ruling that the objection came too late because the witness had already answered the question; the only way then for the defendant to preserve the question for review was by motion to strike the answer and a request that the trial judge instruct the jury to disregard the evidence. Inasmuch as the answer was favorable to the defendant, his counsel probably preferred

to let the answer stand, rather than have a ruling on a motion to strike both the question and the answer. Since the defendant failed to move to strike the answer and for the instruction to the jury to disregard the evidence, the record presents no question for this court to pass upon.

Defendant next contends that the trial court erred in giving instruction No. 10. This instruction is a definition of manslaughter in the first degree and is as follows:

"Homicide is manslaughter in the first degree in the following cases:

"First: When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

"Second: When perpetrated without a design to effect death and in a heat of passion, but in a cruel and unusual manner and by means of a dangerous weapon unless it is committed under such circumstances as constitute excusable and justifiable homicide.

"Third: When perpetrated unnecessarily, either while resisting an attempt by the person killed to commit a crime, or after such an attempt shall have failed."

Defendant admits that the instruction is a correct definition of manslaughter in the first degree, but contends that the instruction is deficient, in that "it fails to take into consideration the element of intoxication on the part of the defendant." The defense interposed was that of an alibi and that the crime was probably committed by another person, naming him. The defendant and all his witnesses testified that the defendant was not intoxicated on the night of the homicide.

In the case of Panther v. State, 43 Okla. Cr. 128, 277 Pac. 247, this court said:

"When a defendant who has a right of election as to several defenses takes the stand as a witness and makes such admissions as to render every theory of defense unavailable save one, he will be deemed to have elected that one."

In the case at bar the defendant elected to rely upon the defense of alibi and that the crime was probably committed by another person, naming him. An instruction upon the defense of justifiable homicide was unnecessary and not required by the evidence in the case.

In the case of Thomas v. State, 18 Okla. Cr. 648, 197 Pac. 853, 857, Judge Bessey, speaking for the court, in the body of the opinion says:

"The defense of self-defense is inconsistent with the defense of intoxication to such an extent as to render one incapable of forming an intent or design to kill. If the defendant was so intoxicated as to be incapable of forming such intent, he would at the same time be incapable of having motives that would cause him to act in self-defense."

In the case at bar, if the defendant did not commit the crime and the same was committed by another person as he contends, it was absolutely immaterial whether the defendant was sober or drunk at the time of the commission of the offense charged. The court was very liberal in giving the defendant the benefit of an instruction on manslaughter, and he cannot now complain that such instruction was insufficient.

Finally, the defendant contends that the trial court erred in failing to instruct on the law applicable to circumstantial evidence. There is no request for any in-

struction on this subject. In the case of Newcomb v. State, 23 Okla. Cr. 173, 213 Pac. 900, 901, in paragraph 6 of the syllabus, this court said:

"No request for an instruction on the law of circumstantial evidence having been interposed, it is held that the failure to instruct on that subject was not reversible error in this case." Klaber et al. v. State, 35 Okla. Cr. 238, 250 Pac. 142.

In the case at bar the state does not rely on circumstantial evidence alone for a conviction. The testimony of the witness Higdon is that the defendant got his shotgun and, forcing the witness to accompany him, announced "that he was going over there and blow those sons of bitches up"; that when they were immediately in front of the door of the place where the homicide was committed and four or five steps from the door, the defendant raised the gun to his shoulder and pointed it toward the door, and after the witness turned away he heard the roar of the gun as the shot was fired. Evidence of this character constitutes more than a circumstance tending to connect the defendant with the commission of the crime.

In the case of Hendrix v. U. S., 2 Okla. Cr. 240, 101 Pac. 125, paragraph 4 of the syllabus, this court said:

"In a case where the prosecution does not rely upon circumstantial evidence alone for a conviction, the accused is not, as a matter of right, entitled to have the jury instructed fully upon the law of circumstantial evidence." Price v. State, 9 Okla. Cr. 359, 131 Pac. 1102; Aday v. State, 28 Okla. Cr. 201, 230 Pac. 280; Hagerty v. State, 22 Okla. Cr. 136, 210 Pac. 300.

Under section 2822, C. O. S. 1921, the Legislature specifically provided that no judgment of conviction should be reversed because of error in the instructions,

unless the court can say after a consideration of the entire record that such error of itself tended to deprive the defendant of a fair trial.

The evidence is amply sufficient to support the verdict of the jury. There was no error of law committed in the trial of the case sufficiently prejudicial to the defendant to justify a reversal of this case.

For the reasons stated, the judgment is affirmed.

EDWARDS, P. J., and DAVENPORT, J., concur.